IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 25-MJ-330 |
| ) | |
| **CRISTHIAN ORTEGA-LOPEZ**, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' BRIEF IN SUPPORT OF
APPEAL OF DETENTION ORDER**

The United States of America hereby submits this brief in support of its Notice of Appeal of Detention, Doc. 13, filed on March 17, 2025.

**I.   BACKGROUND**

On March 3, 2025, a criminal complaint was filed charging Defendant with being an unlawful alien in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(5). Doc. 1. The charge in the criminal complaint was based on the following facts.

In January 2025, Homeland Security Investigations ("HSI") Las Cruces initiated an investigation into the Defendant following the receipt of an anonymous tip submitted on the HSI Tip line. *Id*. The tip alleged that the Defendant, an illegal alien from Venezuela and a suspected member of a criminal gang, was residing with other illegal aliens in the United States at 1220 N. Reymond St., Las Cruces, New Mexico, and in possession of firearms. *Id*. Upon investigation, it was determined that the Defendant unlawfully entered the United States on December 15, 2023, and due to overcrowding at the Border Patrol facility was released on or about December 18, 2023, pending removal proceedings. *Id*.

Agents learned that on December 30, 2024, the Defendant uploaded photographs and videos to his personal Facebook account featuring himself and other Venezuelan illegal aliens, at the Butterfield Shooting Range in Las Cruces, New Mexico, in possession of firearms and a large amount of both handgun and rifle ammunition. *Id*. In addition to photos of him holding a black semi-automatic handgun, which appears to be identified as a Sig Sauer P365 handgun, the Defendant posted a video to his personal Facebook account showing him shooting an AR-15 rifle with a suppressor. *Id*. The Defendant was positively identified as the individual in the video based on his distinctive tattoos. *Id*.

Upon further investigation of the Defendant's social media accounts, Agents identified videos and photographs on his personal social media accounts as well as the personal social media accounts of the other illegal aliens living with him at the aforementioned address that displayed clear indicators of his association with Tren de Aragua ("TdA"), a transnational criminal organization and U.S. designated Foreign Terrorist Organization ("FTO") from Venezuela. *Id*. These indicators included tattoos, clothing apparel, and displaying hand gestures, commonly associated with TdA. *Id*.

On February 28, 2025, two search warrants were executed in connection with this investigation. The Defendant and his roommates were taken into custody. Agents also seized four firearms from April Cano's residence.

During a post-*Miranda* interview, the Defendant admitted that in or around December 2023, he illegally entered the United States from Mexico into Texas. Defendant went to Denver to await his immigration hearing. After not being able to pay the rent, he and his two roommates decided to move to El Paso, Texas because one of the other Venezuelans had a brother that resided there. The Defendant and five other people were residing at an apartment in El Paso when he

eventually met Nancy Cano after getting a job in Las Cruces to install a glass door for her. He continued to do a few jobs for Nancy Cano, and after being evicted from the apartment in April, 2024, Nancy Cano offered her "casita" in the back of the residence she shared with her husband Joel Cano. After coming to reside in Las Cruces, New Mexico, in the earlier part of 2024, the Defendant was introduced Nany Cano's daughter, April Cano, who possessed a large number of firearms. The Defendant advised that April Cano allowed him to hold and sometimes shoot various firearms. The Defendant admitted that he recognized four firearms that had been seized from April Cano's residence on February 28, 2025, following the execution of a search warrant. The Defendant further advised that three of the firearms shown to him were the same firearms depicted in the photographs on his personal social media, specifically a Geissel SD 5.56 rifle, a Sig Sauer P365 9mm handgun, and a Volquartsen VT2 .22 caliber rifle. The Defendant admitted that he knew it was illegal for him to possess firearms.

On March 3, 2025, the Defendant appeared in Las Cruces for his initial appearance on the criminal complaint before U.S. Magistrate Judge Damian Martinez. Doc. 3.

A Pre-Trial Services ("PTS") report was prepared regarding Defendant. Doc. 9. According to the report, Defendant resided in Las Cruces at the aforementioned address. *Id*. at 1-2. On March 13, 2025, an Amended PTS report and a Second Amended PTS report were filed. Docs. 9 – 10. The owner of the property, Nancy Cano, was not assessed as a suitable third-party custodian due to the Defendant being arrested at her residence. Doc. 9 at 1.

On the Second Amended PTS report, Pre-Trial Services assessed that Defendant poses a risk of nonappearance due to the offense charged; lack of familial, residential, community, employment, property, and financial ties in the United States; lack of verifiable, legitimate employment; ties to a foreign country – Venezuela; unstable/unsuitable living situation, and

criminal history. Doc. 10 at 3.  Additionally, PTS assessed that Defendant poses a risk of danger because of the nature of the instant offense, criminal association, gang involvement – specifically potential connection to Tren de Aragua, a transnational criminal organization and a U.S. designated Foreign Terrorist Organization from Venezuela; criminal history, and charge involving violence. *Id*.  Consequently, PTS recommended that Defendant be detained because there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of the community.  *Id.*

On March 14, 2025, United States Magistrate Judge Damian L. Martinez held a detention hearing.  During the hearing, Judge Martinez asked Assistant United States Attorney ("AUSA") Maria Armijo if she knew Judge Cano.  When AUSA Armijo stated she did not, he responded with, "I have. Not in his courtroom, but I've met him before several times and he's got a BS meter like you – a lot of people have never seen. He knows when somebody is BS'ing him." Doc. 20 at p. 40. After hearing argument from the parties, Judge Martinez stated, "Like I said, I don't think Judge Cano has a BS meter and I don't think he would just let anybody live in his property." *Id*. at p. 64.  Ultimately, Judge Martinez found the Defendant was not a flight risk or danger to the community and ordered the Defendant be released.  Judge Martinez also requested PTS conduct another interview with Nany Cano to assess whether or not she could be a third-party custodian. Doc. 18.

On March 17, 2025, the Government filed a Notice of Appeal of Order Setting Conditions of Release. Doc. 13.  As of the filing of this document, no amended PTS report has been filed.

**II.    STANDARD OF REVIEW**

"The standard of review for a magistrate judge's detention or release order under § 3145(a) is de novo."  *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003); *see also United*

*States v. Ramos-Caballero*, 2021 WL 5176051, *2 (10th Cir. Nov. 8, 2021) (unpublished); *United States v. Disher*, 650 F.Supp.2d 1131, 1135 (D.N.M. 2009) ("[t]he district court conducts a de novo review of the Magistrate Judge's pretrial detention order and must make its own determination if pretrial detention is proper").

### III.   LAW REGARDING PRE-TRIAL DETENTION

Pursuant to the Bail Reform Act, a defendant may be detained pending trial only after a hearing, held pursuant to 18 U.S.C. § 3142(f), and upon a finding "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).  At such a hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear and convincing evidence. *United States v. Cisneros*, 328 F.3d 610, 616; 18 U.S.C. § 3142(f). To determine whether there are conditions which can assure the defendant's appearance at trial and the safety of the community, the Court must consider:

(1) the nature and circumstances of the offense charged, including whether the offense . . . **involves a firearm**;
(2) the weight of the evidence against the person;
(3) the history and characteristics of the person, including
   (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance a court proceedings; and
   (B) whether at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
(4) the nature and seriousness of the danger to any person or the community that would be posed by release.

*Cisneros*, 328 F.3d at 617 (citing 18 U.S.C. § 3142(g)) (emphasis added).

5

IV.     **ANALYSIS**

Defendant is both a flight risk and a danger and there are no conditions, nor a combination of conditions, that will adequately ensure the presence of the defendant as required and the safety of the community.

    **A.     Nature and circumstances of the offense and the danger to any person or the community posed by the defendant's release.**

Both the first factor, the nature and circumstances of the offense charged, and the fourth factor, the danger to any person or the community posed by Defendant's release, weigh in favor of pretrial detention. Defendant is charged with being an unlawful alien in possession of a firearm and ammunition, in violation 18 U.S.C. § 922(g)(5).  First, this charge is a serious offense as reflected by the maximum statutory penalty of 15 years. *See* 18 U.S.C. § 924(a)(8).  Second, § 3142(g) expressly directs the court to take into account whether the offense involved a firearm in determining whether pretrial conditions of release can be imposed.  *See* 18 U.S.C. 3142(g)(1); *United States v. Vorrice*, 277 F. App'x 762, 764 (10th Cir. 2008) (noting that firearm offenses are noted in 3142(g)(1) as "particularly significant").

Here, Defendant admitted in his post-*Miranda* statement that he knowingly possessed firearms even though he knew it was illegal for him to do so.  With his exposure to a lengthy prison sentence, Defendant has a strong incentive to abscond if released on conditions in this case.  For all these reasons, this factor weighs against the release of the defendant as both a danger to the community and a risk of non-appearance.

    **B.     The weight of the evidence.**

The weight of the evidence is significant.  Based on the criminal complaint, in addition to posting multiple photos of himself with firearms on his personal social media account, the

Defendant admitted in a post-*Miranda* statement to Agents that he knowingly possessed firearms in violation of the law.

The weight of the evidence against defendant is strong, based upon the photographic evidence and his admissions. Accordingly, this factor also weighs in favor of detention.

    **C.**     **Defendant's history and characteristics.**

The third factor, the history and characteristics of the person, also weighs strongly in favor of detention.

1. <u>The Defendant is a significant flight risk because he is an illegal alien who is in removal proceedings.</u>

The Defendant is not a citizen or national of the United States and entered the United States, into the District of Texas from Mexico, at a location other than a designated port of entry. Specifically, the Defendant entered at or near Eagle Pass, Texas on December 15, 2023. Exh. 1 Warrant for Arrest. The Defendant was not admitted or paroled into the country. At the time of his apprehension, the Defendant was issued a Notice to Appear ("NTA") titled "**In removal proceedings** under section 240 of the Immigration and Nationality Act." Exh. 2 NTA (emphasis added). The NTA clearly indicates the status of the Defendant as "an alien present in the United States who has not been admitted or paroled." Exh. 2. The NTA continues, stating

> The Department of Homeland Security alleges that you:
>
> 1. You are not a citizen or national of the United States;
> 2. You are a native of Venezuela and a citizen of Venezuela;
> 3. You entered into the United States at or near Eagle Pass, TX, on or about December 15, 2023;
> 4. **You were not then admitted or paroled after inspection** by an Immigration Officer.

The NTA continues

> On the basis of the foregoing, it is charged that **you are subject to removal** from the United States pursuant to the following provision(s) of the law: 212(a)(6)(A)(i) of the Immigration and Nationality Act, as amended, in that you are an alien present in the United States without being admitted or paroled, or who entered into the United States at any time or place other than as designed by the Secretary or the Department of Homeland Security.

*Id*. (emphasis added)

The Defendant was issued an Order of Release on Recognizance ("ROR") on conditional parole due to humanitarian and safety issues with overcrowding at the Laredo Sector Enhanced Centralized Processing Center. The ROR Order states the Defendant has been arrested and placed in removal proceedings and is released pursuant to section 236 of the INA. *See* Exh. 3. Section 236(a) of the INA states

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General- (1) may continue to detain the arrested alien; and (2) may release the alien on- (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or (B) **conditional parole**; but (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

*See* 8 USC §1226(a) (emphasis added).

Release on conditional parole under section 236(a)(2)(B) of the INA is legally distinct from release on humanitarian parole under section 212(d)(5)(A) of the INA. *See Matter of Castillo-Padilla*, 25 I&N Dec. 257, 258-63 (BIA 2010). In *Matter of Olty Cabrera-Fernandez, et al., Respondents*, the Board of Immigration Appeals ("BIA") found that an applicant for admission who had been released on conditional parole was not "inspected and admitted or paroled." *See Matter of Olty Cabrera-Fernandez, et al., Respondents*, 28 I&N Dec. 747 (BIA 2023) (finding Cuban respondents who entered illegally, were charged with inadmissibility under section

8

212(a)(6)(A)(i), and released on conditional parole under section 326(a)(2)(B) of the INA did not qualify for adjustment of status as they had not been "inspected and admitted or paroled."). The Defendant does not, nor has ever had, legal status in the United States.

The Defendant did not claim asylum when he was apprehended. Had the Defendant claimed asylum while being processed by Border Patrol, he would have been placed into Credible Fear screening with an Asylum Officer from United States Citizenship and Immigration Services ("USCIS").[1] The Defendant was not issued a credible fear worksheet, as indicated on the second page of the NTA, which, notably, he refused to sign. Exh. 2 at p. 2. The Defendant did file a Form I-589, Application for Asylum and Withholding of Removal four months later on April 24, 2024. Doc. 11 p. 42. This was the biometrics appointment Nancy Cano stated she drove the Defendant to in El Paso. Doc 11 at p.14. This application was improperly filed with USCIS and has been administratively closed for lack of jurisdiction. *See* Exh. 4. When an alien is placed in removal proceedings, jurisdiction of the alien's case transfers from USCIS, an entity of the Department of Homeland Security, to the Executive Office for Immigration Review ("EOIR"), an administrative court under the Department of Justice. As the Defendant had been placed in removal proceedings on December 18, 2023, USCIS cannot adjudicate his asylum claim. Rather, the Defendant must file a Form I-589 directly with the Immigration Court. As of the date of this filing, the Defendant has not done so.

---

[1] Upon apprehension, if an alien indicates an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to their country, they must be referred to an asylum officer for an interview to determine whether they have a credible fear of persecution or torture. *See* USCIS Credible Fear Screenings, Credible Fear Screenings | USCIS.

2. <u>The Defendant is a flight risk because he is an illegal alien who violated the conditions of his release from Border Patrol custody pending his removal hearing.</u>

The Defendant violated the terms of his release. The Defendant's ROR Order lists the conditions that he must comply with which include:

1. You must not change your place of residence without first securing written permission from the immigration officer listed above.
2. You must not violate any local, State, or Federal laws or ordinances.
3. You must assist the Department of Homeland Security in obtaining any necessary travel documents.
4. Other: That you do not commit any crimes while on this order of release.

These requirements are followed by the Notice:

Failure to comply with the conditions of this order may result in revocation of your release and your arrest and detention by the Department of Homeland Security.

The Defendant first violated the terms of his release by failing to seek permission to move or even notify the Department of Homeland Security at the time of his move from his listed address. The Defendant did not receive written permission from the immigration officer to move from his address in Denver to El Paso. Doc. 11 at p.17. In fact, the Defendant never listed the El Paso address he was residing at on any immigration documents submitted to either the Department of Homeland Security or the Department of Justice EOIR.

Second, the Defendant violated the terms of his release by working without authorization. Conditional release under section 236 of the INA prohibits the grant of work authorization.[2] In

---

[2] INA § 236(a)(3) states, "the Attorney General … (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization." See 8 USC §1226(a).

Defense's Notice of Filing of Documents for the Court's Consideration, the Defendant submitted a letter from Nancy Cano, the owner of the property at which he was residing and the proposed third-party custodian, wherein she states she "helped him find different yardwork jobs" and often even "took him to the job." Doc. 11 at p. 14.  By the Defendant's own admission, he routinely violated the terms of his release by working unlawfully.  Doc. 11 at pp. 3, 5, 6, 7, 14.  In fact, that is how the Defendant claims he met Nancy Cano.  In detention arguments, defense counsel stated,

> Through a friend, he was able to get a bus ticket back to El Paso, where he knew someone and he could get part-time work working construction … This is how he meets his third party custodian, Nancy Cano. He and five others were part of a construction crew that were hired to do work on her home. Those were two of the exhibits that we provided to the Court. There were these huge windows installed in the back of her home. But my client, Cristhian he – after doing this job for Ms. Cano, he approaches her, gives her his number and says, ma'am, I'm here, I'm living in El Paso and I'm looking for work.

Doc. 20 at pp.16-17.

Finally, the Defendant violated the terms of his release when he possessed firearms in violation of 18 USC § 922(g)(5) by his own admissions.

Thus, the Defendant has demonstrated he cannot comply by terms of release given to him in administration immigration proceedings and, therefore, poses a significant risk of flight based upon both his past behavior as well as the fact that his conduct has jeopardized the potential immigration benefits he was seeking.

3. <u>The Defendant is a danger to the community because he is a member of the United States designated Foreign Terrorist Organization Tren de Aragua and regularly associates with other members.</u>

The Defendant has clear indicators of gang affiliation, specifically with Tren de Aragua ("TdA"), a transnational criminal organization and a United States designated Foreign Terrorist Organization from Venezuela.  TdA is a violent transnational criminal organization that originated as a prison gang in Venezuela.  TdA has expanded its criminal network throughout the Western

Hemisphere and established a presence in the United States, including New Mexico and the Western District of Texas.

TdA's criminal activities include human smuggling and other illicit acts that target migrants. TdA has developed additional revenue sources through a range of other criminal activities, including drug trafficking, firearms trafficking, commercial sex trafficking, kidnapping, robbery, theft, fraud, and extortion. TdA members also commit murder, assault, and other acts of violence to enforce and further the organization's criminal activities. TdA has formed ties with other criminal groups operating in the Western Hemisphere and, at times, is willing to collaborate with other criminal groups and organizations on a local and ad hoc basis.

In the United States, Tren de Aragua members engage in violent activity that, at times, is attributable to intra-gang conflicts. Some TdA members have disavowed the gang and describe themselves as "Anti-Tren." TdA members engage in shootings and murders that, in part, are related to hostility between TdA and "Anti-Tren" members. A gang member's self-identification as TdA or "Anti-Tren" can be fluid, and a gang member may switch between the two affiliations depending on time and context.

In this case, the Defendant has been designated as a member of TdA, in part, based on the following.

(1) Defendant has tattoos associated with TdA on his body. *See* Exh. 5.

(2) Defendant posted himself wearing a "Real Hasta La Muerta" necklace. *See* Exh. 6.

(3) Defendant posted photographs of himself throwing gang signs that are associated with TdA. *See* Exh. 7.

(4) Defendant commonly posted photographs with emojis that are associated with TdA. *See* Exh. 8.

(5) Defendant associated with other TdA gang members. *See* Exh. 9.

Additionally, agents seized three cellphones that are associated with the Defendant on February 28, 2025. A search of the cellphones revealed the following, which affirms the fact that the Defendant is a TdA member:

(1) A conversation with an individual on April 30, 2024, in which he refers to his AK-47 tattoo as an "Aragua train," and comments that he is worried about telling his "patrona[3]" about it. *See* Exh. 10.

(2) A conversation with an individual in which they discuss the $5,000 award offered by the State of Texas for TdA members and joke about the reward money. *See* Exh. 11.

(3) A conversation with an individual in which the other participant warns Defendant about sending photographs that may jeopardize him in the United States that also includes a request to get a grenade or two 38s. Subsequent to this conversation, there is a set of gruesome photographs of two brutal murder victims that includes mutilated bodies, decapitated heads and dismembered hands. *See* Exh. 12.

Lastly, it should be noted that membership of a terrorist organization is both a ground of inadmissibility as well as a bar from receiving asylum. *See* 8 USC § 1182(a)(3)(B).

### D. CONCLUSION

Defendant should be detained in this case because there are no conditions that will reasonably assure his appearance at future court proceedings and assure the safety of the community.

**WHEREFORE**, the United States respectfully requests that the Court find Defendant is a flight risk and a danger to the community and that no conditions can reasonably assure the defendant's future appearance in Court and the safety of the community, and order that Defendant be detained pending the resolution of this case.

---

[3] "Patrona" is believed to be Nancy Cano.

Respectfully submitted,

HOLLAND S. KASTRIN
Acting United States Attorney

*Electronically filed 3/28/2025*
MARIA YSABEL ARMIJO
RYAN ELLISON
Assistant United States Attorneys
ELIZABETH TONKIN
Special Assistant United States Attorney
200 N. Church Street
Las Cruces, New Mexico 88001

I HEREBY CERTIFY that on March 28, 2025 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system which will send notification to all counsel of record.

*Electronically filed 3/28/2025*
MARIA YSABEL ARMIJO
Assistant United States Attorney